[Cite as *State v. Stroud*, 2023-Ohio-1395.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220270 |
| | | TRIAL NO. B-2002004 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| ANDREW STROUD, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 28, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Bryan R. Perkins*, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1} Defendant-appellant Andrew Stroud appeals his convictions for abduction, accompanied by a firearm specification, and domestic violence. For the reasons set forth below, we affirm the judgment of the trial court.

## Background

{¶2} This case arises from an incident involving Stroud and his on-again-off-again girlfriend, and mother of two of his children, Patrice Powell. According to Powell, the weekend of April 26, 2020, Stroud texted or called Powell approximately 200 times to find out Powell's whereabouts. On April 26, Powell returned home to her apartment complex and saw Stroud sitting in his car in the parking lot. Powell walked into her apartment without stopping to talk to Stroud. Stroud texted Powell that he had come to pick up his television, and he wanted her to come outside. Powell complied. Stroud asked Powell to get in his car, so that they could talk. Powell declined, and then Stroud displayed a firearm. Stroud told Powell that she could get in the car, or he could come back later and shoot her. Powell feared Stroud might be serious, and she also did not want to put someone else in danger, including their son, who was at the apartment and had just walked back inside, so Powell got into Stroud's vehicle.

{¶3} Stroud started driving, and he became irate, questioning Powell about where she had been and accusing her of sleeping with another man. Stroud insisted that Powell unlock her phone, so that he could see it. Powell refused to let him see her phone. Powell tried to get out of the car while Stroud was driving, but Stroud smacked her in the face, and he put his gun to her side. Stroud continued driving, and he

2

showed her that the gun was loaded. Stroud threatened to shoot Powell, or to shoot himself and let the car crash.

{¶4} Stroud continued to question Powell and to demand that she unlock her phone. Stroud's demeanor was erratic, and he pointed the gun at her thigh and her head. Stroud continued driving towards Interstate 75, heading north, and Powell tried to get out of the car again. Stroud struck her in the face. Powell tried to grab the steering wheel, but she was unable to gain control. Powell started to give Stroud her phone, and she tried to grab Stroud's gun. The two struggled over the gun, but Stroud snatched it back. Powell was then able to get out of the car. Powell started running down Interstate 75 into oncoming traffic while yelling and trying to flag down help.

{¶5} Stroud ditched his car on the side of the expressway and started chasing Powell. Stroud caught up to her and threatened to shoot her. The two then began tussling over the gun again. Given that the expressway was fairly crowded at this time of day, two vehicles pulled over and three people stopped to intervene. According to Powell, Stroud put the gun in the pocket of his hooded sweatshirt. One of the bystanders called 911. By the time police arrived, Stroud had left. As a result of Powell's ordeal, the state indicted Stroud for abduction with firearm specifications and misdemeanor domestic violence.

{¶6} At trial, the state presented Powell's testimony, the testimony of the investigating police officer, and the testimony of one of the passing motorists who intervened once he saw Powell running down the interstate.

{¶7} The passing motorist testified that he was traveling home from work on Interstate 75 on April 26 when he saw a woman, Powell, running down the highway and a man, Stroud, chasing after her. The motorist pulled his car off of the highway.

The motorist saw Stroud run to catch up to Powell, and they appeared to be fighting. Powell appeared to be pushing Stroud away. Once the motorist approached Powell, he started talking to her. Powell started crying, and she was acting "hyperactive." The motorist stayed with Powell as she explained what happened, and he waited with her until police arrived.

{¶8} The investigating officer testified that he took a statement from Powell. The officer confirmed with data from Cincinnati police license-plate cameras that Stroud's car had been parked near Powell's apartment. The officer also confirmed that Stroud had contacted Powell between 100 and 200 times leading up to the incident. The officer also photographed Powell's injuries.

{¶9} Stroud testified in his own defense at trial. According to Stroud, he went to Powell's apartment on April 26 because he wanted to let Powell know that their romantic relationship was over, and that he planned to marry someone else. Stroud also wanted to return Powell's possessions. When Powell came out of her apartment, Stroud suggested that they take a ride. Powell agreed, but things turned ugly when Stroud told Powell about his marriage plans. Powell became enraged and spit in his face. Powell tried to grab the steering wheel and demanded that she be allowed to get out of the vehicle. Stroud did not want to leave Powell on the side of the interstate, and Powell seemed to calm down, so he kept driving. Powell then became enraged again, and eventually Stroud pulled the vehicle over in the emergency lane. Powell jumped out of the car and began running into traffic, apparently in a suicidal manner. Stroud ran after her to save her. He was able to pull her to safety. Passing motorists pulled over, and Stroud, who suffers from irritable bowel syndrome, felt that he would defecate in his pants if he did not leave. Stroud left the scene. Stroud went home to

use the bathroom, and when he returned to the scene, everyone had left. Stroud then went to Columbus where his girlfriend's family lived. Stroud later learned that police were looking for him, so he returned to Cincinnati.

{¶10} The trial court found Stroud guilty of all offenses. The court sentenced Stroud to 24 months in prison for abduction, to be served consecutively to a three-year term of imprisonment for the firearm specification. The trial court sentenced Stroud to a concurrent term of 180 days in jail for the domestic-violence offense. Stroud appeals.

### Sufficiency and Manifest Weight of the Evidence

{¶11} We address Stroud's third and fourth assignments of error first. In his third and fourth assignments of error, Stroud argues that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.

{¶12} Stroud was convicted of abduction under R.C. 2905.02(A), which provides that "[n]o person, without privilege to do so, shall * * * [b]y force or threat, remove another from the place where the other person is found * * *." Stroud was also convicted of domestic violence under R.C. 2919.25(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶13} When considering a challenge to the sufficiency of the evidence, an appellate court determines whether, after viewing the evidence in a light most favorable to the prosecution, a rationale trier of fact could have found that the state proved all the elements of the offense beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When considering a challenge to the weight of the evidence, an appellate court must review

the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶14} According to Stroud, Powell's testimony was not credible. Stroud argues that Powell was "biased," because Stroud intended to marry another woman, which made Powell jealous. Stroud attacks Powell's story that he threatened to return and kill her if she did not get in the car. Stroud questions why Powell did not yell for help if he had threatened her with a gun. Stroud also argues that Powell was the sole witness to the crimes, and she did not have physical injuries that required immediate medical attention.

{¶15} Contrary to Stroud's argument, Powell's testimony was corroborated by independent evidence. The passing motorist and Good Samaritan, who risked his own safety by stopping on Interstate 75 during a busy time of day, testified that he saw Powell running from Stroud, and then Stroud standing over Powell. When the passing motorist spoke to Powell, she became extremely upset, crying, and started explaining what happened to her. The motorist called police and waited for police to arrive to ensure her safety. Stroud left the scene before police arrived, and his defense for doing so is not credible under the circumstances: Stroud claims he left the scene because he feared he might defecate on himself, so he went home to use the bathroom. Stroud claims that he later returned to the scene, but everyone had left. Stroud then drove to Columbus.

{¶16} The investigating officer also corroborated Powell's testimony that Stroud had called or texted Powell approximately 200 times prior to showing up at her

apartment the day of the incident. This corroborates Powell's testimony that Stroud was possessive and that he was upset with her because she refused to respond to his texts and calls. The investigating officer also corroborated physical injuries to Powell.

{¶17} Stroud points out that Powell stated in her written statement to police that she had been "pistol-whipped" by Stroud, but she did not testify to such at trial. Powell's written statement provides that Stroud "hit" her with the gun. According to Powell's trial testimony, Stroud had the firearm pointed at her head for a significant portion of their car ride. She felt the gun press against her body, and Stroud hit her in the face at least twice. Powell's trial testimony was not inconsistent with her statement to police where she stated that he hit her with the gun. Stroud also opines that it would be impossible for him to drive and physically attack Powell at the same time; however, it is reasonable that a person could hit another while driving.

{¶18} Finally, Stroud asserts that no independent witness observed a firearm. Even though no other witness corroborated Powell's assertion that Stroud had a firearm, Powell's testimony centered on Stroud's actions in threatening her with a gun, and she maintained that at the time of the incident and at trial. Powell's decision to jump out of a moving car on a busy interstate seems reasonable if she truly feared for her life inside the vehicle and had a loaded gun pointed at her. Powell testified that Stroud hid the gun in the front pocket of his hooded sweatshirt when the passing motorists stopped to intervene. Stroud left before police arrived, so it would have been possible for Stroud to keep the gun hidden. The trial court was in the best position to determine the credibility of the witnesses. *See State v. Landrum*, 1st Dist. Hamilton No. C-150718, 2016-Ohio-5666.

7

{¶19} Viewing the evidence in the light most favorable to the state, the trial court could have reasonably found that Stroud committed domestic violence and abduction with a firearm, and the trial court did not lose its way and create a manifest miscarriage of justice in finding Stroud guilty. *See State v. Jenks*, 61 Ohio St.3d at 273, 574 N.E.2d 492; *State v. Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶20} We overrule Stroud's third and fourth assignments of error.

### *Evidentiary Issues*

{¶21} We next address Stroud's first and second assignments of error. In his first assignment of error, Stroud argues that the trial court erred by refusing to admit statements Powell allegedly made to Stroud the day of the incident, which would demonstrate her reason to fabricate the allegations against Stroud. In his second assignment of error, Stroud argues that the trial court erred by admitting other-acts evidence of Stroud's prior bad acts.

{¶22} With respect to Powell's statements, Stroud testified that when he told Powell he wanted to marry another woman, Powell became outraged. Even though Stroud was driving the vehicle, Stroud claims that Powell struck him, attempted to grab the wheel of the vehicle, and spit on him. According to Stroud, Powell made several statements that the trial court refused to admit, which were proffered outside the presence of the trial court: "You mean to tell me you're really about to go with that bitch and start a new family"; "You don't give a fuck about me and our children"; and "Do you remember when I said we can be friends or enemies? Well, I think we're gonna be enemies."

{¶23} With respect to Stroud's prior bad acts, Powell testified that when Stroud arrived at Powell's apartment, displayed his firearm, and threatened to come

back later and shoot her, Powell believed him, so she got into his vehicle. The state then asked Powell if Stroud had ever threatened her before, to which Powell responded in the affirmative. Powell was then permitted to testify about a time where Stroud became angry at Powell because she would not text him back, and he threatened to beat her face into the ground and to kill himself. Powell was also permitted to testify that Stroud had hit her before.

**{¶24}** In response to Stroud's prior-bad-acts argument on appeal, the state argues that, under the abduction statute, R.C. 2905.02(A)(1), the state must prove that the defendant removed the victim by force or threat of force, and so Stroud's past violence and threats of violence informed Powell's belief that Stroud's threat of harm to her was credible. The state cites cases where courts determined that prior acts of violence between the same defendant and victim were probative of the victim's belief of impending physical harm. However, the cases cited by the state do not deal with abduction, but instead aggravated menacing and domestic violence where the victim's belief of serious physical harm is an element. *See State v. Rhoads*, 12th Dist. Clermont No. CA12-05-040, 2013-Ohio-152 (aggravated menacing); *State v. Collie*, 108 Ohio App.3d 580, 671 N.E.2d 338 (1st Dist.1996) (domestic violence under R.C. 2919.25(C)); *City of Hamilton v. Robertson*, 12th Dist. Butler No. CA98-03-045, 1998 Ohio App.Lexis 5827 (Dec. 7, 1998) (domestic violence under R.C. 2919.25(C)). In this case, even when viewed in an objective manner, Stroud's actions in displaying a gun to Powell and threatening to shoot her later unless she got into his car is a clear threat of physical harm, and Powell's subjective belief is not an element.

**{¶25}** Nevertheless, in a bench trial, and given the remaining evidence at trial, the admission of Stroud's prior bad acts was harmless error. *See* Crim.R. 52(A).

9

Powell's version of events was corroborated by testimony from the passing motorist who saw Powell running down Interstate 75 and helped Powell immediately after the incident, and by testimony from the investigating officer, who documented Powell's injuries and confirmed the 200 texts or calls Stroud made to Powell in the days prior to the incident. Stroud's defense that he drove to Powell's apartment to tell her that he was marrying another woman is not credible considering his actions leading up to the incident. Furthermore, Stroud's defense for leaving the scene before police arrived and driving to Columbus is also not credible given the circumstances.

{¶26} With respect to Powell's statements, which Stroud proffered outside of the trial court's presence, any error in the trial court's refusal to admit these specific statements was harmless given the evidence at trial. *See* Crim.R. 52(A). Moreover, Powell's defense was not "gutted" as he suggests, because the trial court admitted Stroud's testimony that Powell became angry and spit at him, and that Powell became suicidal.

{¶27} Finally, Stroud argues that the trial court erred in allowing the prosecutor to question Stroud about his child-support arrearage and failure to make support payments. Given the remaining evidence at the bench trial, this does not amount to plain error. *See* Crim.R. 52(B); *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶28} We overrule Stroud's first and second assignments of error.

### *Ineffective Assistance of Counsel*

{¶29} We address Stroud's sixth assignment of error next, in which Stroud argues that he received ineffective assistance of counsel. Stroud argues that his counsel was ineffective only if this court determines that Stroud's counsel should have

cross-examined Powell regarding the following alleged statements she made to Stroud during the incident: "You mean to tell me you're really about to go with that bitch and start a new family"; "You don't give a fuck about me and our children"; and "Do you remember when I said we can be friends or enemies? Well, I think we're gonna be enemies."

**{¶30}** As stated in the analysis under the first assignment of error, the failure of the trial court to admit Powell's alleged statements was harmless error. Therefore, we overrule Stroud's sixth assignment of error.

## *Firearm Specifications*

**{¶31}** In his fifth assignment of error, Stroud argues that the trial court erred by failing to merge the two firearm specifications for purposes of sentencing.

**{¶32}** The judgment entry of conviction shows that the trial court merged the two firearm specifications for purposes of sentencing. The trial court also sentenced Stroud to a three-year prison term on only one firearm specification.

**{¶33}** Therefore, the record does not demonstrate the error of which Stroud complains, and we overrule the fifth assignment of error.

## *Conclusion*

**{¶34}** Having overruled Stroud's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.


**BERGERON, P.J.,** and **KINSLEY, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

11